Belknap, }
Dec., 1899. }

SMITH, *Adm'r*, v. BOSTON & MAINE RAILROAD.

In an action against a railroad company for negligently causing the death of
a traveler at a highway crossing, evidence that it was the uniform habit of
the deceased to slacken the speed of his horse, and look and listen for ap-
proaching trains, is competent as tending to show his conduct at the time
of injury.
A traveler upon a highway, who is about to drive upon a grade crossing
with which he is familiar, is justified in assuming that he will be noti-
fied of an approaching train by the warning whistle required by statute ;
but whether he is at liberty to rely altogether upon such warning, is a
question of fact and not of law.
The fact that a traveler upon a highway does not look and listen for an ap-
proaching train before attempting to drive over a grade crossing is not
conclusive, as matter of law, of a want of due care on his part.

CASE, for causing the death of John L. Cate by negligence at a
highway grade crossing, known as the Waukewan crossing, situ-
ated about half a mile northerly of the Meredith station. Trial
by jury. A view of the crossing was taken. The railroad ap-
proaches it from a southerly direction on a curve, the center of
which is on the same side of the track as the highway. The
angle between the track and highway is acute ; and the surface of
the land is considerably higher than the surfaces of the roadbeds.
There is a dwelling-house upon this ridge about 300 feet south-
erly of the crossing. There is a snow fence, seven or eight feet
high, along the easterly side of the railroad, both northerly and
southerly of the crossing,—the opening in it for the highway
being fifteen to eighteen feet wide. The end of the fence on the
southerly side of the crossing is about thirty feet from the nearest
rail, and the fence extends southerly on the ridge 300 feet or
more. The ridge, the fence, and the house obstruct the view of
the railroad more or less. The evidence relating to the extent of
the obstruction was conflicting. Several witnesses testified that
one could not see cars passing on the railroad until he got right
on the track. The defendants introduced evidence of experi-
ments made on a moonlight but cloudy evening during the trial,
which tended to show that light from the headlight and the fire
box of a locomotive, and from the cars, can be seen above the
fence, or through cracks in it, the most, if not all, of the way
from the dwelling-house to the crossing ; and that when within
thirty-five feet of the track, one can see by the end of the fence
the headlight at a point 166 feet southerly of the crossing ; and

when within fifteen feet of the track, at a point 633 feet distant. There is also a highway grade crossing immediately south of the Meredith station.

Cate was forty-six years old, and a man of good habits. He always lived on a farm situated about three miles from Meredith Village. The Waukewan crossing was on the highway between the farm and the village. He passed over this highway frequently. He considered the crossing dangerous, and when about to pass it always checked the speed of his horse to a walk and looked and listened for a train.

About half past eleven o'clock in the night of October 7, 1898, as Cate was driving from the village toward his home in a covered buggy drawn by a steady horse, not afraid of cars, he was struck by the defendants' express passenger train going north, and was killed. The night was cloudy, misty, and dark. The evidence tended to show that such a train had passed through Meredith at about the same hour, when on time, for twenty-five years; that it was nearly on time this night; that it did not stop at the station unless signaled to do so; that it did not stop there this night, and that it was going at its usual speed at that point (about twenty-five miles an hour) at the time of the collision. The plaintiff called fifteen witnesses who testified, in substance, that they were in situations where they could hear locomotive whistles sounded at each of the crossings, and that they did not hear a whistle for the Waukewan crossing, but did hear one for the station crossing. The engineer of the train testified that he sounded the usual crossing whistle eighty rods from the Waukewan crossing, and then rung the bell until he saw the head and forward part of Cate's horse come from behind the fence right out of the darkness, three or four rods ahead of him, when he set the air brake at the emergency point. Other train men and other employees of the defendants,— nine in all,— and two other persons, testified that they heard this whistle.

The defendants' motion at the close of the evidence that a verdict be directed in their favor was denied, subject to exception.

The defendants requested the following instruction to the jury : "It was the duty of Cate, before attempting to cross the track, to look and listen for approaching trains. And it was his duty to do this when sufficiently near the track that from failure to see or hear a train at that time he might fairly assume that no train would reach the immediate vicinity of the crossing before he had passed it, yet not too near to enable him to stop his horse and avert a collision with any train whose approach he might discover. If you find that he failed to look and listen at the proper time as here explained, you will return a verdict for the defendants."

They also requested an instruction substituting the words "look or listen" for "look and listen" in the above. The court substituted the words, "take such precautions to learn of the approach of trains as men of ordinary prudence would take in like circumstances," for "look and listen for approaching trains" in the first sentence, and "look and listen" in the last sentence, and gave the instruction as so modified; and the defendants excepted.

The defendants also requested the following instruction: "[The] evidence [which] has been submitted here that it has been the constant habit of Cate for many years to stop or check his horse on approaching the Waukewan crossing and look and listen for approaching trains [is no proof that he was a cautious or careful man, and the law does not permit you to so construe it]. The reason for admitting such evidence in this class of cases is that a man is apt to do by force of habit that which it is his fixed and constant practice to do under the same circumstances. You are to consider Cate's habit of looking and listening at this crossing only as having some tendency to show that he checked his horse, looked, and listened on the night of the accident, as usual. Upon all the evidence, whether he did or not act that night according to his habit is for you to say." The instruction was given without the words included in brackets, and the defendants excepted.

The jury found, in answer to special questions submitted at the defendants' request: (1) That the whistle was not sounded at the Waukewan crossing; (2) that Cate did not have knowledge of the approach of the train at a sufficient distance before reaching the crossing to enable him by the exercise of ordinary care to prevent the collision; (3) that his want of knowledge on this point was due to the defendants' fault; and (4) that a man of ordinary prudence and judgment, possessing Cate's knowledge of the crossing and its surroundings, and such knowledge as he had or ought to have had of the approach of the train, would have understood he could pass in safety at the time Cate drove upon the track.

A general verdict in favor of the plaintiff having been returned, the defendants moved to set it aside and for a new trial.

*Frank M. Beckford* and *Stone & Shannon*, for the plaintiff.

*Frank S. Streeter* (with whom were *Jewett & Plummer*), for the defendants.

I. A verdict should have been directed in the defendants' favor because the plaintiff failed to sustain the burden of proof of the deceased's due care.

(*a*) "The law does not transfer the burden of an injury from the suffering party to another, by compelling the payment of dam-

ages, without proof of a cause for such action. Legal ground for the law's intervention involves the plaintiff's innocence of fault." *Deschenes* v. *Railroad,* 69 N. H. 285, 288. "A person injured by reason of his want of ordinary care, or (since the law makes no apportionment between actual wrongdoers) by the joint operation of his own and another's negligence, is remediless." *Nashua Iron and Steel Co.* v. *Railroad,* 62 N. H. 159, 161.

"The plaintiff has the burden of proving that he was careful." *Lisbon* v. *Lyman,* 49 N. H. 553, 566. He "must establish both propositions, namely, that by ordinary care he could not, and the defendant could, have prevented the injury." *Nashua Iron and Steel Co.* v. *Railroad, supra,* 165; *Brember* v. *Jones,* 67 N. H. 374, 376. "The burden is upon the plaintiff to prove both these essential propositions." *Hutchins* v. *Macomber,* 68 N. H. 473.

"If upon all the evidence it is clear that reasonable men cannot differ in the conclusion that the question is undetermined by the evidence, then the finding must be against the party sustaining the burden of proof. . . . In the absence of some evidence as to the fact, a judicial trial does not substitute an unfounded guess or conjecture for the legal proof which the law requires." *Deschenes* v. *Railroad, supra,* 289, 291.

(*b*) In *Huntress* v. *Railroad,* 66 N. H. 185, it was held that "In an action against a railway company by the administrator of a person killed by a train on a level highway crossing, when there is no evidence that the deceased was insane or intoxicated or that he committed suicide, and no direct evidence on the question of his negligence, his exercise of ordinary care may be inferred from the instinct of self-preservation."

The opinion does not state that the burden of proving the deceased's due care can be sustained in a different manner by "the administrator of a person killed by a train on a level highway crossing" than by the administrator of a person killed under any other circumstances, or that a dead man's due care can be established in a manner that a live man's cannot; nor does it intimate that there is any legal presumption of freedom from contributory fault. It simply asserts the broad proposition that the "instinct provided for the preservation of animal life" affords a premise from which an inference that a given human being has in a given situation exercised ordinary care for his own protection may reasonably and logically be drawn. The only question is whether that proposition of pure fact is true. We think the following excerpt from the opinion discloses the answer to that question:

"In *Reynolds* v. *Railroad,* 58 N. Y. 248, 252, it was said 'the jury might infer that the deceased was governed by the natural instinct of self-preservation, and would not put himself recklessly

and consciously in peril of death.'    But it was also said ' that men are careless and subject themselves thereby to injury is the common experience of mankind, and when injured, no presumption exists in the absence of proof that they were exercising due care at the time.'   In this remark, 'absence of proof' apparently means absence of other proof than the instinct from which, it is admitted, the jury might infer that the deceased would not put himself recklessly and consciously in peril of death."    *Huntress* v. *Railroad*, *supra*, 189.

The New York court recognized a difference between putting one's self "recklessly and consciously in peril of death," and failing to conform to the standard of prudence which the law prescribes. The learned author of the opinion in *Huntress* v. *Railroad* evidently considered the two things one and the same thing.   If there is no difference between them, a charge to a New Hampshire jury in a negligence case that " if the defendant was negligent the plaintiff is entitled to recover, unless he put himself recklessly and consciously in peril of death," is unexceptionable.   Is not such a proposition absurd?

Undoubtedly, judicial notice may be taken of the laws of nature and the facts of everyday human experience.   Undoubtedly, these natural laws and common facts may be adopted by jurors " as grounds of decision in cases not shown to be exceptions to such rules."    *Huntress* v. *Railroad*, *supra*, 188.    In the absence of proof to the contrary, it is a reasonable and sensible inference that a given human animal is a normal specimen of his species rather than a physical or mental monstrosity, and therefore that he is sane and that he possesses, in greater or less degree, the instincts inherent in all normal human creatures.   But when from the presence of one of these instincts it is sought to infer further that the animal conducted himself in a particular way in a particular situation, there must at least be some logical connection between the presence of the instinct and the conduct sought to be inferred.

Whether there is any such connection between the presence of the instinct of self-preservation and the exercise of ordinary care depends upon the character and known operation of the instinct, and the meaning of the phrase " ordinary care."    The instinct of self-preservation is the innate, inborn love of life and dread of death which man, in common with the lower animals, possesses in a normal state.   Its known operation is an involuntary shrinking back from the conscious incurring of deadly peril, and an involuntary endeavor to escape from deadly peril suddenly perceived to be impending.    The natural shrinking from an attempt to cross a swirling stream upon a treacherous log, the impulsive dodging to avoid a missile, are characteristic manifestations of its opera-

tion. Ordinary care is the conduct in a given situation, not of any and all normal human beings considered as animals, but of the average human being considered as a rational agent. It is the conduct in a given situation of a person who pays an average degree of attention to his surroundings, forecasts their possibilities of danger with average sagacity, chooses measures whereby to avert the danger with average discrimination, carries out those measures with average skill.

The presence of the instinct is evidence of such conduct only as its known operation tends to induce, and is evidence of this only when it is shown to have been called into operation. The instinct induces only action that is impulsive, unreasoning, unreflecting, and is called into operation only by the actual consciousness of imminent peril. From the presence of the instinct, it may doubtless be inferred that the person whose conduct is in question did not " put himself recklessly and consciously in peril of death," or passively and consciously await impending death. It cannot be inferred that he made such intelligent use of his faculties as a person of average prudence would to ascertain whether his conduct might put him in peril of death; or, if his reason had time to assert itself after he became conscious of the peril he had incurred, that he directed his efforts to escape with average judgment. The conclusion that he exercised due care is, therefore, a palpable *non sequitur*.

In *Lyman* v. *Railroad*, 66 N. H. 200, the same conclusion was announced as in the Huntress case, namely, that an administrator could prove the deceased's due care without showing what his conduct in fact was. As the two cases were decided together at the same term of court, they have but the force of one decision upon this question. Moreover, a comparison of the two opinions weakens the force of each; for they exhibit such a remarkable diversity of reasons for their common conclusion as to indicate that the majority of the court were in fact agreed only on the point that an administrator could, upon some theory, prove without evidence due care on the part of his intestate, and that they did not carefully consider upon what ground such a result could be arrived at.

In the Huntress case, the decision was rested solely on the " instinct of self-preservation " theory. In the Lyman case, it was said (1) that the burden of proving the plaintiff's exercise of proper care is " easily satisfied"; (2) that his exercise of such care " may, under some circumstances, be inferred from the ordinary habits and dispositions of prudent men, and the instinct of self-preservation "; and (3) that " it is a presumption of common sense, as well as of the common law, that persons of mature years and in possession of their senses are ordinarily prudent, and will exercise ordinary diligence to avoid danger."

If the burden of proving due care is " easily satisfied," it would seem unnecessary to invoke the aid both of a presumption of law and of various inferences of fact that due care had been exercised in order to hold that the burden had been sustained. And how can the burden of proving any fact be satisfied more easily than by evidence from which a reasonable mind could conclude that the fact existed? If it is a "presumption of the common law" that "persons of mature years and in possession of their senses are ordinarily prudent, and will exercise ordinary diligence to avoid danger," why was the presumption never discovered prior to 1890? And why was no mention made in the Huntress case of a discovery which shifted the burden of proof and rendered it wholly immaterial whether due care could or could not be inferred from the instinct of self-preservation? According to the general understanding of the bar, the practice of shifting the burden of proof by legal presumptions was largely abandoned in this state years before *Lyman* v. *Railroad* was decided. *Savings Bank* v. *Getchell*, 59 N. H. 281; *State* v. *Hodge*, 50 N. H. 510; *Lisbon* v. *Lyman*, 49 N. H. 553. In *Paine* v. *Railway*, 58 N. H. 611, 613, it was said that " negligence is a fact for . . . the jury to find or not, without any presumption of law one way or the other. "

If my previous comments on the Huntress case are sound, the animal instinct of self-preservation furnishes no rational or logical basis for a finding that due care has been exercised. The remaining suggestion of the Lyman case is that the exercise of such care may be inferred from the " ordinary habits and dispositions of prudent men." The theory evidently is, that as ordinary care is the conduct of the average man, and average men must be more numerous than men whose character for prudence is below the average, it is more probable than otherwise that a particular man is an average man, and therefore that he has acted as such in a given situation. This is an exceedingly convenient method of determining a disputed question of fact. There is a wide field for its application. The question being whether A has performed any given act, the jury may determine that issue according as they are of the opinion that the majority of men do, or do not, so conduct under similar circumstances. But the difficulty about this formula for reaching conclusions is, that it is not an inference from fact to fact, but a pure speculation upon the doctrine of chances — an importation into the administration of justice of the methods of the gaming table. The difference between the two things is, or ought to be, obvious. The question whether the death of A, which resulted from a grade crossing accident, was occasioned by the fault of the railroad without contributing fault on his part, cannot be determined by a judicial tribunal by finding that the

majority of such accidents are occasioned by the fault of the railroad, or of the traveler, or of both, or of neither.

In *Huntress* v. *Railroad* and *Lyman* v. *Railroad*, cases from the states of New York, Pennsylvania, Maryland, Missouri, Iowa, and Nevada are cited in support of the propositions that due care may be inferred from the instinct of self-preservation and from the habits of prudent men. So far as *Johnson* v. *Railroad*, 20 N. Y. 65, lends support to such a doctrine, it has been completely exploded by the later cases in that state. *Warner* v. *Railroad*, 44 N. Y. 465; *Reynolds* v. *Railroad*, 58 N. Y. 248; *Cordell* v. *Railroad*, 75 N. Y. 330; *Bond* v. *Smith*, 113 N. Y. 378; *Wiwirowski* v. *Railway*, 124 N. Y. 420; *Riordan* v. *Steamship Co.*, 124 N. Y. 655. The cases cited from Pennsylvania, Maryland, and Missouri are of no weight in this jurisdiction, for in each of those states the defendant has the burden of proving the plaintiff's fault; hence, the question before the court in these cases was not whether there was any evidence of the plaintiff's due care, but whether, in the absence of affirmative evidence of his conduct, his contributory negligence was conclusively proven. In the Iowa case cited not a word is said with reference to the questions we are discussing; and in the Nevada case it was merely held not reversible error to instruct a jury that they might consider the ordinary disposition of men to guard themselves against danger as lending probability to the plaintiff's positive testimony that he listened for trains.

How is the burden of proving the deceased's due care to be sustained? The answer is obvious. It can be sustained in the same way, and in the same way only, as the burden of proving the defendant's negligence. If the accident is one which evidently could not happen without fault of the defendant, the plaintiff may rest on the maxim, *res ipsa loquitur;* otherwise the defendant's actual conduct must be shown before it can be determined whether that conduct conformed to the legal standard. *Foss* v. *Baker*, 62 N. H. 247, 249-251. So if the accident is one which the injured party evidently could do nothing to bring about or prevent, it is unnecessary to show his conduct; but if it is one which his conduct evidently would have a share in bringing about or preventing, his actual conduct must appear before it can be tested by the standard which the law prescribes. *McLane* v. *Perkins*, 92 Me. 39; *Chase* v. *Railroad*, 77 Me. 62; *Hinckley* v. *Railroad*, 120 Mass. 257, 261-263; *Crafts* v. *Boston*, 109 Mass. 519, 521; *Wakelin* v. *Railway*, L. R. 12 App. Ca. 41. This is the doctrine of *Deschenes* v. *Railroad*. This is the practical application of the rule that "the plaintiff must establish both propositions, namely, that by ordinary care he could not, and the defendant could, have prevented the injury." If that rule is not to be applied in practice, it should not

be announced from the bench. If it is to be applied at all, it should be applied in the only manner consistent with the dictates of common sense, and without regard to the status of the injured party as a servant of the defendant or a traveler upon a highway. No other method of administering the law is just or fair.

(c)  How Cate happened to be upon the crossing at the moment of the collision is left by the evidence wholly to speculation and conjecture. If Cate's carelessness is not conclusively established by the reported facts, the court which decided *Deschenes* v. *Railroad* cannot do otherwise than hold that the jury's finding of due care on his part is an "unfounded guess."

Upon the question whether Cate made use of his senses before driving upon the crossing, in order to ascertain whether a train was coming, there is no evidence except his previous habit. If his habit alone is sufficient to prove anything, it proves that somewhere in the immediate vicinity of the crossing he checked his horse, looked both ways, and listened for approaching trains, as usual. If he did this, the inference from the mechanical facts seems irresistible that he discovered the approach of the train with which he subsequently collided. There certainly is no evidence that he did not discover it. If he discovered it how did he come to be upon the track at the fatal moment? All is conjecture. In the words of the supreme court of Maine, in a very similar case, "how the unfortunate man got into his awful situation no one seems to know, and no evidence explains to us." *Chase* v. *Railroad*, 77 Me. 62, 67.

It may be that Cate acted "upon an error of judgment in regard to the speed of the train and the time that would elapse before its arrival." *Huntress* v. *Railroad*, *supra*, 190. But the plaintiff cannot recover upon such a theory without proof that Cate's error of judgment was one which a person of average judgment would have made, and a person of average prudence have acted upon, under the same circumstances, and that Cate exercised proper care to get his team over the crossing before the train arrived. In each of these respects the plaintiff's case is fatally defective. How near the engine was to the crossing when Cate tried to pass is mere conjecture; and, so far as appears, Cate could easily have cleared the crossing by paying some attention to the progress of a train which he knew to be approaching, and urging his horse to a faster gait. "The facts proved are equally consistent with a theory of the accident which would discharge the defendants as with one that would charge them." *Deschenes* v. *Railroad*, *supra*.

II. Either the instruction that it was Cate's duty to look and listen, or the instruction that it was his duty to look or listen,

should have been given. The only facilities possessed by a human being for informing himself as to his surroundings and their attendant dangers are the five senses, and but two of these are capable of affording information whether it is safe to attempt the crossing of a railroad track. The approach of a train cannot be discovered by intuition, nor felt, nor smelt, nor tasted. Any attempt which a traveler may make, any precaution which he may take, any care which he may exercise, to learn whether a train is coming, must consist in a use of his sense of sight or his sense of hearing. People of ordinary prudence, when confronted by a grade crossing, either (1) look or listen, or both, or (2) refrain from the slightest effort, fail to exercise the slightest care, to ascertain whether it is safe to pass. Between these two alternatives there can be no middle ground.

This court has repeatedly held, in cases too recent and familiar to require citation, that it is the duty of the trial judge to withdraw from the jury, on request, a question on which reasonable minds cannot fairly differ. The instruction requested, in its "look or listen" form, was nothing more than an instruction that Cate was bound to exercise some care to learn whether it was safe to drive upon the crossing, and was drawn upon the theory that all fair-minded men must agree that a person of ordinary prudence, in his situation, would have made some effort to ascertain whether a train was coming. The instructions given permitted the jury to find that if Cate exercised no care and made no effort to learn whether a train was coming, his conduct was consistent with that ordinary care which the law demanded of him.

Are ordinary care to learn whether trains are approaching, and no care to learn whether trains are approaching, in the case of a traveler at a grade crossing, one and the same thing? Are ordinarily careful people, average people, people in general, in the habit of driving upon grade crossings in a state of absolute physical and mental repose, utterly regardless of the possible and probable presence of deadly peril; or is it their practice at such places to make some effort to ascertain whether an attempt to pass will result in fatal consequences? We submit that these questions are capable of but one answer that is consistent with natural reason; and that answer is the one given in *Lake Shore etc. R. R.* v. *Miller*, 25 Mich. 274, 292, where the court said: "The more obvious dictates of common sense and principles of human action . . . courts are bound judicially to know and apply. . . . They are bound to know that there is a difference between *reasonable care* and *no care at all*, . . . that it is always dangerous for persons or teams to go or drive upon the track without first ascertaining that no train is likely to be passing at the same time,

and that if the person so approaching takes no means whatever for this purpose, does not even look to see when sight is available, or when it is not does not stop to listen, but goes blindly upon the track, such conduct is not only not duly careful, but positively careless; and the court is bound to know that such is not the reasonable degree of care which ordinary men should, or do, use in the face of such danger."

The steam railroad is now more than half a century old. The public highways have everywhere been intersected by its tracks at grade beyond the memory of the present generation. There are now 995 grade crossings in New Hampshire alone. The passage of such crossings has been for many years an everyday event in the life of every citizen. It is safe to say that no danger incident to our modern civilization is so generally understood. The precautions available against the danger are simple and self-evident, and are the same in all cases. It is matter of common knowledge and universal experience that those precautions are always observed by the great majority of men. At every hour of the day, in every part of the land, people are traveling over these crossings and protecting themselves by using the eyes and ears which nature has provided for their use in such situations. Except in New Hampshire, the courts long since recognized these common facts and ceased to submit to juries the question how the average man conducts as he approaches a grade crossing. When the constant recurrence of a given situation, day after day and year after year, has made the conduct of the average man in that situation a matter of common knowledge, is the judicial eye forever to be closed to that fact in New Hampshire, and the question how such a man conducts in that situation forever to be submitted to juries to answer as they will?

Is there anything in the constitution of New Hampshire which prohibits this court from perceiving, as other courts perceive, that human experience has rendered the action of the average man approaching a grade crossing, and looking and listening, synonymous terms? Is there anything in the constitution of New Hampshire which restrains this court from administering the law of negligence as other courts administer it, in a manner that is practical and conformable to the common experience of men, and which requires this court to administer that law in a manner that is visionary and opposed to the experience of all men? Were findings, contrary to fact and repugnant to common sense, that conduct which every fair-minded man knows to be reckless carelessness constitutes ordinary carefulness, among the inestimable benefits of trial by jury intended to be secured to the people of New Hampshire by their bill of rights?

This court has repeatedly answered the last three questions in the negative. *State* v. *Railway*, 65 N. H. 663; *Young* v. *Railroad*, 69 N. H. 356; *Allen* v. *Railroad*, 69 N. H. 271. In these cases, the certainty of the court's knowledge that the plaintiffs had been careless enabled the court (as it understood) to act upon that knowledge without invading the jury's constitutional province, and required it so to act. But how did the court know, with such a degree of certainty, that these plaintiffs had been careless? Was it not because the general knowledge and experience of men at once condemned their conduct as careless? How do other courts know, with the same degree of certainty, that a person is careless who drives upon a grade crossing without looking or listening for trains? Because " the general knowledge and experience of man at once condemn his conduct as careless." *Allyn* v. *Railroad*, 105 Mass. 77, 79. Because " the experience and observation of all men are matters of which courts take notice, and these agree in pronouncing such an omission a negligent one." *Lynch* v. *Railroad*, 69 Fed. Rep. 86, 88. Are not the general knowledge, experience, and observation of men the same in New Hampshire as in our sister states? If they are, will not this court take notice of that knowledge, experience, and observation in grade crossing cases, as it takes notice of them in master and servant cases? Is it fair to compel juries to recognize in the suits of freight brakemen, yet permit them to disregard in the cases of travelers at grade crossings, what the experience and observation of all men teach?

" To be sure, the statute requires a railroad company to give specified warnings; but it neither takes away a man's senses nor excuses him from using them." *Wilds* v. *Railroad*, 24 N. Y. 440. One may not shut his eyes against the possibility of another's negligence if ordinary care would disclose it to him. *Nashua Iron and Steel Co.* v. *Railroad*, 62 N. H. 159, 162. Why did the legislature require the erection of warning signs at grade crossings, if, at sight of the sign, a traveler is entitled to close his eyes and ears, and drive on in absolute confidence that if a train is coming he will be awakened by its whistle from his state of placid rest? How many citizens of this state, when warned by one of these signs to " LOOK OUT FOR THE ENGINE," ever said to themselves, " I have a right to disregard this injunction, to refrain from looking out for the engine, because it is the company's duty to whistle, and if it fails to whistle it must pay damages for my death?" Does not this court *know*, with even greater certainty than it knew that Willis, Young, and Allen were careless, that men in general do not reason thus, but make use of their faculties at these crossings to learn whether it is safe to pass?

We hereinafter cite 151 cases, decided by sixty-two different courts of appeal in fifty-four separate jurisdictions, which hold that failure to look or listen, one or both, before driving upon a grade crossing, is negligence as matter of law. In other words, in thirty-nine states, five territories, the District of Columbia, seven federal circuits, England, and Canada, the courts have held that common experience has conclusively demonstrated that the great majority of people employ their senses of sight and hearing, or at least one of these, before venturing upon a railroad track, to ascertain whether they can safely cross ; that a finding that want of any care in grade crossing cases constitutes ordinary care is therefore contrary to fact and repugnant to reason ; and that the "look or listen" rule has accordingly emerged from the region of disputable fact and become a rule for judges to enforce.

May it not be possible that when, with substantial unanimity, the judiciary of the English-speaking world agree that the imputation of carefulness to certain conduct defies human experience and outrages reason, that *consensus* of opinion is entitled to consideration ? Is there anything unique in the latitude or longitude of New Hampshire which here demands, in railway crossing cases, a method of administering the law of ordinary care wholly at variance with the method of nearly every other English-speaking court on the face of the earth ? If there is, may not the bar be informed why ?

ALABAMA. The traveler must look and listen. *South etc. R. R.* v. *Thompson,* 62 Ala. 494 ; *Louisville etc. R. R.* v. *Webb,* 90 Ala. 185 ; *Georgia etc. R. R.* v. *Lee,* 92 Ala. 262.

ARKANSAS. The traveler must look and listen. *Railway Co.* v. *Cullen,* 54 Ark. 431 ; *St. Louis etc. R'y* v. *Martin,* 61 Ark. 549 ; *Little Rock etc. R'y* v. *Blewitt,* 65 Ark. 235.

CALIFORNIA. The traveler must look and listen. *Fleming* v. *Railroad,* 49 Cal. 253 ; *Glascock* v. *Railway,* 73 Cal. 137 ; *Hager* v. *Railroad,* 98 Cal. 309.

COLORADO. The traveler must look and listen. *Denver etc. R. R.* v. *Ryan,* 17 Col. 98 ; *Chicago etc. R'y* v. *Crisman,* 19 Col. 30.

CONNECTICUT. The traveler must look and listen. *Peck* v. *Railroad,* 50 Conn. 379.

DAKOTA. The traveler must look and listen. *Bertelson* v. *Railway,* 5 Dak. (Terr.) 313 ; *Elliot* v. *Railway,* 5 Dak. (Terr.) 523.

DELAWARE. The traveler must look and listen. *Lyman* v. *Railroad,* 4 Houst. 583.

DISTRICT OF COLUMBIA. The traveler must stop and look. *Warner* v. *Railroad,* 7 App. Ca. D. C. 79 ; *Baltimore etc. R. R.* v. *Adams,* 10 App. Ca. D. C. 97.

FLORIDA.. The traveler must look and listen. *Louisville etc. R. R.* v. *Yniestra*, 21 Fla. 700; *Railroad Co.* v. *Foxworth*, 25 So. Rep. 338.

GEORGIA. The traveler must look. *Comer* v. *Shaw*, 98 Ga. 543; *Ashworth* v. *Railway*, 97 Ga. 306.

ILLINOIS. The traveler must look or listen, unless exceptional circumstances excuse a want of the precautions ordinarily taken by prudent men. *Chicago etc. R. R.* v. *McKean*, 40 Ill. 218; *Chicago etc. R. R.* v. *Jacobs*, 63 Ill. 178; *Chicago etc. R. R.* v. *Damerell*, 81 Ill. 450; *Chicago etc. R. R.* v. *Dimick*, 96 Ill. 42; *Chicago etc. R. R.* v. *Thorson*, 68 Ill. App. 288; *Chicago etc. R. R.* v. *Stewart*, 71 Ill. App. 647.

INDIANA. The traveler must look and listen. *Bellefontaine etc. R'y* v. *Hunter*, 33 Ind. 335; *Mann* v. *Railroad*, 128 Ind. 138; *Cadwallader* v. *Railway*, 128 Ind. 518; *Thornton* v. *Railway*, 131 Ind. 492; *Pittsburg etc. R'y* v. *Fraze*, 150 Ind. 576.

INDIAN TERRITORY. The traveler must make a vigilant use of the senses of sight and hearing. *Chicago etc. R'y* v. *Pounds*, 35 S. W. Rep. 249.

IOWA. The traveler must look and listen. *Benton* v. *Railroad*, 42 Ia. 192; *Starry* v. *Railway*, 51 Ia. 419; *Tierney* v. *Railway*, 84 Ia. 641; *Crawford* v. *Railway*, 80 N. W. Rep. 519.

KANSAS. The traveler must look and listen. *Union Pacific R'y* v. *Adams*, 33 Kan. 427; *Atchison etc. R. R.* v. *Townsend*, 39 Kan. 115; *Atchison etc. R. R.* v. *Willey*, 60 Kan. 819.

KENTUCKY. The traveler must look. *McCain* v. *Railroad*, 18 S. W. Rep. 537; *Louisville etc. R. R.* v. *Survant*, 44 S. W. Rep. 88.

LOUISIANA. The traveler must look and listen. *Brown* v. *Railway*, 42 La. An. 350; *Herlisch* v. *Railroad*, 44 La. An. 280; *Vincent* v. *Railroad*, 48 La. An. 933.

MAINE. The traveler must look and listen. *State* v. *Railroad*, 76 Me. 357; *Lesan* v. *Railroad*, 77 Me. 85; *Chase* v. *Railroad*, 78 Me. 346; *Allen* v. *Railroad*, 82 Me. 111; *Smith* v. *Railroad*, 87 Me. 339; *Giberson* v. *Railroad*, 89 Me. 337.

MARYLAND. The traveler must look and listen. *Md. C. R. R.* v. *Neubeur*, 62 Md. 391; *Union R. R.* v. *State*, 72 Md. 153; *Western Md. R. R.* v. *Kehoe*, 83 Md. 434; *State* v. *Railroad*, 87 Md. 183; *Hearn* v. *Railroad*, 89 Md. 762.

MASSACHUSETTS. The traveler must look and listen. *Butterfield* v. *Railroad*, 10 Allen 532; *Allyn* v. *Railroad*, 105 Mass. 77; *Tully* v. *Railroad*, 134 Mass. 499; *Fletcher* v. *Railroad*, 149 Mass. 127; *Tyler* v. *Railroad*, 157 Mass. 336; *Chase* v. *Railroad*, 167 Mass. 383; *Ellis* v. *Railroad*, 169 Mass. 600.

MICHIGAN. The traveler must look and listen. *Lake Shore etc. R. R.* v. *Miller*, 25 Mich. 274; *Matta* v. *Railway*, 69 Mich.

109; *Brady* v. *Railroad*, 81 Mich. 616; *Shufelt* v. *Railroad*, 96 Mich. 327; *Bond* v. *Railway*, 117 Mich. 652.

MINNESOTA. The traveler must look and listen. *Brown* v. *Railway*, 22 Minn. 165; *Studley* v. *Railway*, 48 Minn. 245; *Magner* v. *Truesdale*, 53 Minn. 436; *Judson* v. *Railway*, 63 Minn. 248.

MISSISSIPPI. The traveler must "exercise his faculties." *New Orleans etc. R'y* v. *Mitchell*, 52 Miss. 808.

MISSOURI. The traveler must look and listen. *Fletcher* v. *Railroad*, 64 Mo. 484; *Zimmerman* v. *Railroad*, 71 Mo. 476; *Hayden* v. *Railway*, 124 Mo. 566; *Lane* v. *Railway*, 132 Mo. 4.

MONTANA. The traveler must look or listen. *Hunter* v. *Railway*, 22 Mont. 525.

NEBRASKA. The traveler must look and listen. *Omaha etc. R'y* v. *Talbot*, 48 Neb. 627; *Chicago etc. R. R.* v. *Pollard*, 53 Neb. 730.

NEVADA. The traveler must look or listen. *Solen* v. *Railway*, 13 Nev. 106; *Bunting* v. *Railroad*, 14 Nev. 351.

NEW JERSEY. The traveler must look and listen. *Blaker* v. *Railroad*, 30 N. J. Eq. 240; *Hamilton* v. *Railroad*, 50 N. J. Law 263; *Delaware etc. R. R.* v. *Hefferan*, 57 N. J. Law 149; *Conkling* v. *Railroad*, 63 N. J. Law 338; *Swanson* v. *Railroad*, 63 N. J. Law 605.

NEW MEXICO. The traveler must look and listen. *Candelaria* v. *Railroad*, 6 N. M. 266.

NEW YORK. The traveler must look and listen. *Wilds* v. *Railroad*, 24 N. Y. 430; *Wilcox* v. *Railroad*, 39 N. Y. 358; *Salter* v. *Railroad*, 75 N. Y. 273; *Tolman* v. *Railroad*, 98 N. Y. 198; *Rodrian* v. *Railroad*, 125 N. Y. 526; *Scott* v. *Railroad*, 130 N. Y. 679; *Hennessy* v. *Railway*, 17 App. Div. 162.

NORTH CAROLINA. The traveler must look and listen. *Parker* v. *Railroad*, 86 N. C. 221; *Randall* v. *Railroad*, 104 N. C. 410; *Mesic* v. *Railroad*, 120 N. C. 489.

OHIO. The traveler must look and listen. *Bellefontaine R'y* v. *Snyder*, 24 Ohio St. 670; *Cleveland etc. R'y* v. *Elliott*, 28 Ohio St. 340; *Pennsylvania R. R.* v. *Rathgeb*, 32 Ohio St. 66; *Pennsylvania Co.* v. *Morel*, 40 Ohio St. 338.

OKLAHOMA. The traveler must look and listen. *Severy* v. *Railway*, 6 Okla. 153.

OREGON. The traveler must look and listen. *Durbin* v. *Railroad*, 17 Or. 5; *Smith* v. *Railway*, 29 Or. 539; *Blackburn* v. *Company*, 34 Or. 215.

PENNSYLVANIA. The traveler must stop, look, and listen. *North Pennsylvania R. R.* v. *Heileman*, 49 Pa. St. 60; *Aiken* v. *Railroad*, 130 Pa. St. 380; *Myers* v. *Railroad*, 150 Pa. St. 386; *Holden* v. *Railroad*, 169 Pa. St. 1; *Ritzman* v. *Railroad*, 187 Pa. St. 337.

RHODE ISLAND. The traveler must look and listen. *Ormsbee* v. *Railroad*, 14 R. I. 102; *Chaffee* v. *Railroad*, 17 R. I. 658; *McCanna* v. *Railroad*, 20 R. I. 439.

SOUTH CAROLINA. The plaintiff's want of ordinary care is not a defence. By statute, he may recover unless "guilty of gross or willful negligence, or acting in violation of the law." Whether failure to look or listen constitutes such gross or willful negligence is held to be a question for the jury.

TENNESSEE. The traveler must look and listen. *Patton* v. *Railroad*, 89 Tenn. 370; *Railway Co.* v. *Howard*, 90 Tenn. 144.

TEXAS. The traveler must look and listen. *G. H. & S. R'y* v. *Bracken*, 59 Tex. 71; *Galveston etc. R'y* v. *Kutac*, 72 Tex. 643; *Texas etc. R'y* v. *Brown*, 2 Tex. Civ. App. 281.

UTAH. The traveler must look and listen. *Olsen* v. *Railway*, 9 Utah 129.

VERMONT. The traveler must "make vigilant use of his sight and hearing." *Manley* v. *Canal Co.*, 69 Vt. 101; *Carter* v. *Railroad*, 72 Vt. 190.

VIRGINIA. The traveler must look and listen. *New York etc. R. R.* v. *Kellam*, 83 Va. 851; *Marks* v. *Railroad*, 88 Va. 1; *Johnson* v. *Railroad*, 91 Va. 171; *Ayers* v. *Railroad*, 27 S. E. Rep. 582.

WASHINGTON. The traveler must look and listen. *Northern Pacific R. R.* v. *Holmes*, 3 Wash. (Terr.) 202; *Lewis* v. *Railroad*, 4 Wash. (State) 188.

WEST VIRGINIA. The traveler must look and listen. *Beyel* v. *Railroad*, 34 W. Va. 538; *Berkeley* v. *Railway*, 43 W. Va. 11.

WISCONSIN. The traveler must look and listen. *Rothe* v. *Railroad*, 21 Wis. 258; *Williams* v. *Railway*, 64 Wis. 1; *Nelson* v. *Railroad*, 88 Wis. 392; *Schneider* v. *Railroad*, 99 Wis. 378; *Cawley* v. *Railroad*, 101 Wis. 145.

There are no cases upon the question in the remaining states and territories outside New Hampshire, namely, Arizona, Idaho, North Dakota, South Dakota, and Wyoming.

U. S. SUPREME COURT. The traveler must look and listen. *Railroad Co.* v. *Houston*, 95 U. S. 697; *Schofield* v. *Railway*, 114 U. S. 615; *Elliott* v. *Railway*, 150 U. S. 245; *Northern Pacific R. R.* v. *Freeman*, 174 U. S. 379.

U. S. CIRCUIT COURTS OF APPEALS. The traveler must look and listen. *Stowell* v. *Railroad*, 98 Fed. Rep. 520 (2d Circ., 1899); *Philadelphia etc. R. R.* v. *Peebles*, 67 Fed. Rep. 591 (3d Circ., 1895); *Southern Railway* v. *Smith*, 86 Fed. Rep. 292 (5th Circ., 1898); *Gilbert* v. *Railroad*, 97 Fed. Rep. 747 (6th Circ.,

1899); *Walker* v. *Kinnare*, 76 Fed. Rep. 101 (7th Circ., 1896); *Chicago etc. R'y* v. *Pounds*, 82 Fed. Rep. 217 (8th Circ., 1897); *Lynch* v. *Railroad*, 69 Fed. Rep. 86 (9th Circ., 1895). There are no C. C. A. cases in the first and fourth circuits.

CANADA. The traveler must look and listen. *Nicholls* v. *Railway*, 27 U. C. Q. B. 382; *Johnson* v. *Railroad*, 34 U. C. Q. B. 432.

ENGLAND. The traveler must look. *Skelton* v. *Railway*, L. R. 2 C. P. 631; *Stubley* v. *Railway*, L. R. 1 Ex. 13; *Davey* v. *Railway*, L. R. 11 Q. B. D. 213; *S. C.*, L. R. 12 Q. B. D. 70.

*Frank S. Streeter*, orally, for the defendants. I submit a practical question with reference to the administration of the law of negligence. Why are plaintiffs in negligence cases divided into two classes? Why should one rule of ordinary care be applied to one class of plaintiffs, and a different rule be applied to the other? If such practice does not rest on sound reason, why should it longer obtain? No such distinction is found in the statement of the law from the bench. In the practical application of the law, the distinction is observed.

I find in the books that "a person injured by reason of his want of ordinary care, or by the joint operation of his own and another's negligence, is remediless"; that "negligence of the defendant, however great, does not relieve the plaintiff from the duty of exercising ordinary care"; that the duty of both to exercise ordinary care "is equal and reciprocal"; that "neither is exonerated from his obligation [to exercise ordinary care] by the present or previous misconduct of the other." I also find in the books that "the plaintiff has the burden of proving that he was careful and that the defendant was not careful"; that "the plaintiff must establish both propositions," namely, that he exercised ordinary care and the defendant did not; that before a recovery can be had, it must be established that the defendant was negligent and that the plaintiff was in the exercise of ordinary care; that "in the absence of some evidence as to the fact [of ordinary care], a judicial trial does not substitute an unfounded guess or conjecture for the legal proof which the law requires." These are general statements of the law of ordinary care applicable to all plaintiffs, without distinction of class, and are taken from the New Hampshire cases cited in the brief for the defendants.

If these statements of the law should be submitted to a person whose mind was thoroughly trained in some other department of learning, he would understand that every plaintiff injured by his own want of ordinary care was remediless; that the burden of proof was on such plaintiff to establish his own due or ordinary care; that if he did not sustain such burden of proof he could not

recover; that such burden of proof must be sustained by affirmative evidence, not by speculation or guesses. But if that person of trained mind should follow the administration of the law of ordinary care, he would find that the language of the foregoing statements of law is inaccurate; that it is applicable to one class of plaintiffs and inapplicable to another class; and he might well ask: Why does the court make a general statement of the law of ordinary care applicable in terms to all plaintiffs, while, in fact, it is applied only to one class of plaintiffs? I submit the same inquiry.

The following cases illustrate what we mean by the first class of plaintiffs, who, in practice, are not exempted from the duty of exercising ordinary care: *Hanley* v. *Railway*, 62 N. H. 274; *Bancroft* v. *Railroad*, 67 N. H. 466; *Collins* v. *Car Co.*, 68 N. H. 196; *Nourie* v. *Theobald*, 68 N. H. 564; *Burnham* v. *Railroad*, 68 N. H. 567; *Allen* v. *Railroad*, 69 N. H. 271; *Young* v. *Railroad*, 69 N. H. 356; *Leazotte* v. *Railroad*, *ante, p.* 5.

In six of these eight cases the plaintiff had a verdict by the jury. In the other two the trial judge ordered a nonsuit. At the law term the six verdicts were set aside and the two nonsuits sustained. In these cases the law court examined the evidence submitted to the jury and found as a fact in each case that if the plaintiffs did not observe and understand the dangers to which they subjected themselves, they failed to exercise that ordinary care which the law required of them and therefore could not recover. The method of reasoning used by the law court—not by the trial judge, or by the jury—is illustrated by the following language of Mr. Justice *Chase* in *Allen* v. *Railroad :* "He [Allen] ascended the car so near the place where the telltale would ordinarily be, that it was his duty to use his eyesight to ascertain whether he was inside or outside its location. . . . If he had looked for a telltale, he would necessarily have learned that there was none. It follows that if, in fact, he did not know that there was none, it was because he did not do his duty." It is true that this was a so-called assumption of risk case; but it not appearing that Allen in fact knew of the danger, it is said that he assumed the risk because ordinary care on his part would have disclosed the danger. The real question was whether he exercised ordinary care,—there was no other question; and this court, on the evidence, logically and necessarily found that he did not exercise that care, and on that ground alone held that he could not recover.

In *Young* v. *Railroad*, upon the evidence before the law court, it was found as a fact that, in the language of the court, "it is entirely clear, in our opinion, that the plaintiff was himself guilty of contributory negligence barring his recovery." Contributory negligence is failure to exercise ordinary care; and the finding of this

court, contrary to that of the jury, was that because the plaintiff did not exercise ordinary care he could not recover.

It seems that the plaintiffs in these cases constitute a class to whom the law of ordinary care is administered by the court as stated in the books.

The following cases show what we mean by the second class of plaintiffs, who seem to be exempted in practice from the application of the rules of ordinary care: *Huntress* v. *Railroad*, 66 N. H. 185; *Evans* v. *Railroad*, 66 N. H. 194; *Lyman* v. *Railroad*, 66 N. H. 200; *Davis* v. *Railroad*, 68 N. H. 247; *Folsom* v. *Railroad*, 68 N. H. 454.

In each of these cases the plaintiff had a verdict. In the first four (with the possible exception of the Lyman case) the evidence before the law court plainly showed that the persons represented by the plaintiffs had closed their eyes, stopped up their ears, and voluntarily permitted their horses to take them on a grade crossing in front of an approaching train; and that in the collisions which were the logical and necessary result of their own acts, they were killed. In the last case the injured man used his eyes, saw the train, and voluntarily tried to pass first. The failure of the injured person to exercise ordinary care in each of these cases was shown to the law court by incontrovertible evidence, and was known to the court with a higher degree of certainty, if that were possible, than the same fact in the first class of cases; but the court declined to exercise its reasoning powers as it did in the first class of cases, and these verdicts were sustained.

It is said that the ground for the declination of the court to exercise the same powers of natural reason in the cases of this second class of plaintiffs that it exercised in the cases of the first class of plaintiffs, is that in the cases of the second class the fact of the exercise of ordinary care is for the jury alone; and that the court cannot revise its finding, although it knows with absolute certainty that the finding is wrong. The difference, not in theoretical statement, but in the practical administration by the law court, of the law of ordinary care to these two classes of plaintiffs, is obvious. May not the bar ask the court the reason for such anomalous and apparently inconsistent administration of the law of ordinary care; and if sound reasons for such inconsistency do not exist, may not the bar with propriety urge the adoption of a uniform practice in considering negligence cases?

In this case, if Cate had been a servant of the railroad, a verdict undoubtedly would have been directed for the defendants at the trial term, and most certainly at this law term, on the ground that Cate knew, or ought to have known, of the peril to which he voluntarily subjected himself. Cate was not a servant, but a

traveler upon a highway. He drove in front of a regular train at a grade crossing. His horse was one used in farm work, perfectly safe for a child to drive, familiar with moving trains, and without fear. There was no fact regarding the danger of that crossing not known to Cate. The train had regularly passed over that crossing in the same direction, at the same time (unless late), for more than twenty-five years. The train was running at its usual speed. The headlight was burning brightly. Cate's senses of vision and hearing were unimpaired. He might have looked. He might have heard. He might have stopped. He did neither, but drove upon the crossing and was killed.

To which class of plaintiffs does he belong,— the first, which is never exempted by this court from the duty of exercising ordinary care, or the second, which frequently is exempted? Or shall he be placed in a class with Willis (*State* v. *Railway*, 65 N. H. 663), where the law court examined the evidence and found as a fact that "a jury could not reasonably or properly find a verdict for the state. There is no evidence that the defendant was negligent, or that the deceased was exercising ordinary care at the time of the injury. On the contrary, there is affirmative evidence of carelessness on the part of the deceased, and of the exercise of due care by the defendant. . . . The deceased lost his life through his own carelessness." I cite that case in a class by itself, because Willis was not a servant, but a stranger.

In the Duquette case (*Burnham* v. *Railroad*) the court say: "The plaintiff was bound to prove that the special danger causing the injury was not known to Duquette, and in the exercise of ordinary care by him would not have come to his knowledge." The law court examined the evidence and found therefrom, as a fact, that Duquette did not use ordinary care, and, therefore, the plaintiff could not recover. The reasoning power of the court was set in motion and allowed to investigate the question whether Duquette did use ordinary care. Will not the court permit the same reasoning power to be set in motion to investigate the question whether Cáte used ordinary care? The jury said Duquette was exercising ordinary care. The court, upon investigation, said that finding was against reason, and set the verdict aside. The jury have also said that Cate was exercising ordinary care. If the court, upon investigation, find that such a verdict is also against reason, will it allow the same to stand?

Compare Allen's case with this case. That Allen was a servant on the top of a freight car, and Cate a traveler over a highway crossing, does not affect the question of their legal duty. Allen was charged with the legal duty of using ordinary care, and that alone, in avoiding danger,— precisely the same ordinary care

with which Cate was charged. The court said in the Allen case that the reason he could not recover was because " he did not do his duty." Our claim in this case is that no recovery can be had because Cate " did not do 'his duty." Upon the question of Allen's using ordinary care, the evidence was examined by this law court. The reasoning above quoted was not the reasoning of the jury, or of the trial judge, but of this law court. This court was investigating the question of fact whether the evidence could properly be submitted to the jury, and whether the jury would be warranted in finding upon that evidence that Allen was in the exercise of ordinary care ; and the decision by this law court was that upon the evidence Allen could not recover, whatever the verdict of the jury might be, " because he did not do his duty."

The court's findings in the Allen case are all logically deduced from the proposition of law that it was Allen's duty to look. But was it any more the duty of Allen to look than it was the duty of Cate to look ? If it was Allen's duty to look, could Cate perform his duty by shutting his eyes ? If ordinary care required Allen to look, did not ordinary care require Cate to look ? As the law court found in the Allen case, will it not so find in the Cate case ? Is there any reason why the same tests should not be applied by this law court to determine Cate's failure to use ordinary care as to determine Allen's like failure ? Is there any mysterious difference in the rule of ordinary care when applied to a servant charged with the duty of looking for a telltale, and to a traveler over a grade crossing charged with the duty of looking for a train ? Is there any distinction between the failure of the plaintiff Allen, and the failure of the plaintiff's intestate Cate to discharge the same duty of using ordinary care ? Ought the law to be so administered by this court that Allen's failure shall be finally considered by a tribunal of trained and highly cultivated minds, and Cate's failure be finally determined by a tribunal of utterly untrained and uncultivated minds ? Is not Cate's defendant legally entitled to the benefit of a re-examination of Cate's verdict by the same minds and the same mental processes by which Allen's verdict was re-examined? And if on such re-examination of the evidence the mind of the court is forced to the same conclusion as in the Allen case, is not Cate's defendant entitled to the same judgment?

Compare Young's case with this case. In the Young case, the court, upon re-examination of the evidence, said: " He [Young] deliberately stepped between the rails, and, as the engine approached him at an unknown rate of speed,— without invitation from any source, and while under no compulsion nor constrained by any sudden exigency, with ample opportunity to exercise his

judgment,— . . . he voluntarily took the chance of stepping or jumping on to the pilot. . . . To hold under these circumstances that it could be reasonably and properly found by the jury that the plaintiff was exercising due and ordinary care at the time of his injury because he 'supposed the engine was a safe one' would be 'upholding a refinement that would hardly be relied upon if the defendants were not a corporation, and regarding that as sufficient evidence to justify an action that would not be so regarded in a suit between two natural persons.'"

In this case a re-examination of the evidence will convince the mind of the court that if Cate discharged his duty to look, he "deliberately" drove on the crossing "as the engine approached him at an unknown rate of speed"; that he had no "invitation from any source" to drive in front of the train; that he was "under no compulsion"; that he was not "constrained by any sudden exigency"; that he had "ample opportunity to exercise his judgment"; and that he voluntarily or with absolute indifference took the chance of driving in front of a moving engine which was sure to injure him if a collision occurred, and when, if he looked, he must have known that a collision was inevitable. If the affirmation of the verdict in the Young case would be "upholding a refinement" intolerable to the conscience of this court, will the same court decline to set in motion the same conscience, and, through mere passivity thereof, permit the upholding of a like "refinement" in the Cate case, and one equally intolerable and equally contrary to reason? Is not Cate's defendant entitled under the law to have the judgment of the same judicial reason as was Young's defendant?

We make no suggestion that this court can, or ought, to disturb or interfere with the functions of the jury, or that there should be any impairment of the right of trial by that tribunal which has heretofore obtained. We do not ask this law court to consider the evidence of ordinary care on the part of plaintiffs whom, for convenience of designation, I have placed in the second class, with any different mind, or by any different mental processes, than those whereby the evidence of ordinary care on the part of plaintiffs of the first class is considered by the same court. We do ask that in the practical administration of the law requiring ordinary care of plaintiffs, all plaintiffs, and all defendants as well, shall stand with equal practical rights before the court; that the court shall no longer say in certain cases, "we cannot here exercise our reason and judgment in a re-examination of the evidence showing the plaintiff's failure to exercise ordinary care, because in this class of cases it has not been the custom of the court to interfere with verdicts of juries, however contrary to reason they

may be." The rules of law applicable to all plaintiffs and all defendants are uniform. We ask that in the practical administration of the same rules there shall be the same uniformity.

*Frank S. Streeter*, for the defendants, on motion for rehearing.

I. During the last twenty years (since *Nutter* v. *Railroad*, 60 N. H. 483), the members of the bar have seen that in actions for personal injuries resulting to travelers upon highways from collisions at level crossings, a method of administering the law has grown up that is absolutely unique and equivalent in practical effect to a denial to railroad companies of the equal protection of the law. The observation of this inconsistent development of unique administration of legal principles was not confined to lawyers representing the railroads, but was well understood by those members of the bar who represented, or could represent, the parties injured in such collisions. The attention of both classes of lawyers was especially directed to this anomalous condition when the opinion of the court in the Huntress case was announced at the June term, 1890, and was again sharply arrested by the decision in *Davis* v. *Railroad* at the December term, 1894.

It is well understood that this abnormal and inconsistent development is as fully appreciated by the individual members of the present court as by both classes of lawyers here referred to. That a system of administering legal principles which is not based upon reason and which does not give to all citizens the equal protection of the law cannot permanently endure, must be obvious to every one. But the present difficulty is that certain opinions have been printed in the reports, and that there is a natural reluctance, fully appreciated by the bar, to change the policy of administration thus adopted, however inconsistent and abnormal that policy may be found to be.

In *Nutter* v. *Railroad*, 60 N. H. 483 (1881), the plaintiff walked along the defendants' roadbed in the city of Dover, between two tracks, to a street crossing. As he neared the crossing a train was also approaching it, in full and unobstructed view. He heard the noise of the train and knew that it was coming and near at hand, but did not look to see how near or on which track it was, although a single glance would have told him. Turning at the crossing and stepping upon one of the tracks, he was struck by the train and injured. The court declined to hold that his failure to look at the approaching train before attempting to cross the track was conclusive of want of ordinary care on his part, and a verdict in his favor was permitted to stand.

In *Huntress* v. *Railroad*, 66 N. H. 185 (above referred to), the plaintiff's intestate attempted, with a kind and gentle horse, to pass a railroad track at a country crossing ahead of a passenger train,

and was struck and killed. The warning signs required by law were at the crossing; the whistle was properly sounded; the bell was properly rung; the trainmen were admittedly free from fault. As the decedent approached the crossing she had an unobstructed view of the track, in the direction from which the train was coming, for about a mile. Whether she took any precautions to avoid the collision, whether she did or did not look for the train, how and why she came to drive on the track in front of the train, were questions which the evidence left entirely to speculation and conjecture. The court held that the jury might properly impute negligence to the defendant company in not (1) reducing the speed of its trains to a point admittedly incompatible with the necessities of public transportation, or (2) providing a gate or watchman to protect travelers against miscalculation of the speed, and might properly infer that the "instinct provided for the preservation of animal life" led the decedent to exercise ordinary care; and a verdict for the plaintiff was permitted to stand.

In *Davis* v. *Railroad*, 68 N. H. 247 (above referred to), the plaintiff's intestate attempted the passage of a country crossing, in a hay-rack, in advance of an express passenger train, and was struck and instantly killed. As he drew near the crossing he had a view of the coming train for 600 feet. There was evidence, and the court assumed, that he looked for the train and saw it. With this knowledge of the train's approach he walked his horses up to the crossing, walked them without pause upon the crossing, was walking them at the instant of the collision. The court held that the jury might properly declare the decedent's attempt to make the crossing in this manner an ordinarily prudent act, and a verdict for the plaintiff was permitted to stand.

In *Folsom* v. *Railroad*, 68 N. H. 454 (1896), McMurphy drove along a street which was nearly parallel with the defendants' track, toward a point where the street and track intersected. A passenger train was approaching the crossing from the same direction. The whistle was properly sounded, but McMurphy did not hear it. When McMurphy was from 100 to 120 feet, and the train 593 feet, from the crossing, an alarm whistle was blown. McMurphy then looked, saw the train, swung his whip, and engaged in a race with the train for the crossing, which resulted in his fatal injury. His horse was somewhat afraid of cars, but had never been known to become unmanageable; and on this occasion, until the very instant of the collision, exhibited no signs of fright. The court held that the jury might properly find McMurphy's proximity to the track with such a horse to have been an emergency in which an ordinarily prudent person would have done as he did, and a verdict for the plaintiff was permitted to stand.

The rules of law which determined whether the plaintiffs in these cases were entitled to recover were the familiar rules applicable to all actions for negligence, and about them there was no dispute. In each case it was the defendant company's duty to exercise that care which ordinarily prudent people, operating the railroad under those circumstances, would have exercised to avoid the collision. In each case it was equally the plaintiff's (or decedent's) duty to exercise that care which ordinarily prudent people, traveling upon the highway under those circumstances, would have exercised to avoid the collision. Each plaintiff was remediless under existing law if the collision was due to his own failure to perform his own duty, or to the mutual neglect of duty of himself and the defendants. Each plaintiff, in order to recover, was bound to prove that the collision resulted wholly from the defendants', and not in any degree from his own, want of ordinary care.

How were these rules administered in these cases? By permitting juries utterly to abrogate them; by investing jurors with the legislative power of expanding the duty of ordinary carefulness which rests upon railroads into a duty of insuring the safety of every traveler at every one of the 995 level crossings in New Hampshire; by a method which enables every person injured at a level crossing in New Hampshire, by reason of his own default of duty, to cast the burden of his injury upon the railroad; by a method under which any person may commit deliberate suicide at a level crossing in New Hampshire, with absolute confidence that, although eyewitnesses have observed his every act, the railroad will be mulcted for his family's support. Are these statements exaggerated? These cases themselves furnish a clear answer.

Take the Huntress case. If no other fault can be found with the railroad company's conduct, the jury may impute negligence to it for not (1) reducing the speed of its trains to an extent incompatible with the known requirements of public travel at the present day, or (2) providing gates or watchmen at ordinary country crossings. To adopt the first alternative is impossible. To adopt the second alternative is to assume, at enormous expense, the whole duty of avoiding collisions — in other words, the duty of insurers — at each and every level crossing within the geographical limits of the state.

Take the Nutter case. The traveler neither looks nor listens, but goes upon the track without making the least effort to ascertain whether a train is coming; or the traveler hears the train approaching, but goes upon the track without even looking to see whether there is apparently time to pass ahead of it. In either case a single glance would have disclosed the situation; yet in

each case the jury may declare, contrary to fact, that the traveler's utter want of all care was ordinary carefulness, the court will decline to interfere, and the company must pay.

Take the McMurphy case. The traveler, seeing the coming train in season to wait, loses his head, lashes his horse, and takes the chances of a blind race for the crossing. The jury are authorized to transfer to the company the consequences of his taking leave of his senses, if his horse, though never unmanageable, was, like most horses, restive in the vicinity of cars.

Take the Davis case. The traveler sees the approaching train in season either to wait, or, by urging his horses from a walk to a trot, to pass the crossing first. He does neither, but deliberately walks to destruction and makes no effort, even at the last moment, to avert the impending catastrophe by an increased speed. The jury are allowed to mulct the company for the benefit of his estate.

Take, again, the Huntress case. The plaintiff, charged by law with the burden of proving that the accident was occasioned wholly by the company's and not at all by the decedent's fault, fails to show how or in what manner the accident happened, what the decedent did or failed to do. The jury are permitted to guess that, because the decedent probably did not wish to die, he was as careful as the average person would have been under like circumstances; and the company must pay.

The Nutter, McMurphy, and Davis cases exhaust the possible forms both of simple carelessness, and of gross and reckless carelessness, of which a traveler upon a highway can contrive to be guilty at a grade crossing. We confidently submit that the ingenuity of the human intellect is unequal· to imagining conduct on the part of such a traveler at such a place that is not capable, according to one or another of these decisions, of being adjudged due care. We as confidently submit that the decision in the Davis case affords a sure and easy method of committing suicide at corporate expense. The decision in the Huntress case removes the only remaining difficulties which plaintiffs in this class of actions can possibly encounter; if the railroad has exercised all the care it could short of abolishing the possibility of collisions, or if the plaintiff is unable to prove the circumstances of the accident, a recovery may still be had.

If the constitution conferred upon juries the absolute and uncontrollable power of rendering verdicts regardless of the law and facts, the defendants would have no reason to complain of the court's method of administering the law in these cases, and the responsibility for the results reached would rest with the jurors alone. But such is not the fact. Before the earliest of these

cases was decided, this court announced from the bench, in unmistakable language, that it possessed the constitutional right, and was charged with the legal duty, of withdrawing from the jury every case in which reasonable and unbiased minds could not fairly differ as to whether a right of recovery existed under the law. *Paine* v. *Railway*, 58 N. H. 611.

If the rule announced in *Paine* v. *Railway* were a meaningless generality,— if the court consistently refrained in all classes of cases from interfering with the verdicts of juries, however contrary to law and reason they might be,—those representing the defendants in this class of cases might still think, as they think today, that it is a delusion and a snare to announce a legal rule from the bench and then administer that rule in such a manner as inevitably to avoid its natural and logical results. But they could not complain of inequality in the administration of the law to their clients in crossing cases in the same manner and by the same methods whereby it was administered in all cases to all citizens who contributed to the maintenance of the government.

Such, however, is not the situation. The rule announced in *Paine* v. *Railway* is a meaningless generality in level crossing cases only. In other negligence actions that rule has been freely applied in practice, and juries uniformly confined within the limitations set by law and reason. Take, for example, master and servant cases. From June, 1893, to June, 1899, inclusive, a period of six years, the court passed in law term upon nineteen cases of this class in which the question reserved was whether the jury could reasonably and fairly find from the evidence that the plaintiff was entitled to recover. In five only of these cases was that question answered in the affirmative. In the remaining fourteen the court held, as matter of law, that whatever the jury's finding was or might be, the plaintiff had failed to sustain the burden of proof that was upon him and therefore could not prevail.

Contrast these practical results with the practical results reached in the crossing cases. Not a single case of the latter class, so far as careful research has informed us, has ever been withdrawn from a New Hampshire jury. This, notwithstanding that the prevailing treatment of crossing suits by the court has led defendants to try only such cases of that character as exhibited unusual and glaring carelessness on the part of the traveler, or were cases of pure conjecture ; while the servant cases, by reason of the very different treatment which they receive at the court's hands, have been much more freely contested.

It is difficult to avoid the belief that in such a system of administering the law of the land there is inequality and discrimination —a denial to the defendants in the one class of cases of the same

protection by that law which is extended to the defendants in the other class. If such belief rested upon the foregoing considera-tions only, counsel and parties defendant might, perhaps, doubt the teachings of their own reason. They might suspect that prejudice had influenced that reason; and that, in very truth, a traveler cannot by any possibility be guilty of carelessness at a grade crossing too gross for reasonable minds to deem it careful-ness. But when they find their views supported by almost every English-speaking judiciary on the face of the earth, except in New Hampshire and South Carolina, and find that in the latter state the court is controlled by a statute, they feel great confidence that the views expressed in this and the foregoing briefs are sound and must ultimately prevail.

We respectfully protest against a method of administering the law in these crossing cases, and specifically in this Cate case, which is repugnant to the teachings of everyday human reason, which is equivalent to the granting to juries of letters of marque and re-prisal against defendants, which is without parallel in any other common-law jurisdiction, and which violates the fundamental principle that all defendants and all plaintiffs stand alike before the law. We believe that the present case is a proper one in which to determine whether that method of administration ought longer to obtain.

If the decisions complained of are wrong, every additional opin-ion based on the same erroneous grounds and printed in the re-ports will increase the inevitable ultimate embarrassment. With the belief that the foundation on which these cases rest ought to be re-examined and carefully reconsidered for the benefit of parties de-fendant, the bar, and the court itself, we have urged the views heretofore and now expressed. We do not intend to be unduly persistent, nor to cause the court needless labor, but only to do what we conceive to be our plain professional duty, not alone to the defendants in this case, but to the bar and to the court.

II. Upon the question of Cate's due care, the burden of proof, under the law of New Hampshire as stated in the books, was with the plaintiff. He failed as matter of law to sustain that burden, if "it is clear that reasonable men cannot differ in the conclusion that the question is undetermined by the evidence." *Deschenes* v. *Railroad*, 69 N. H. 285.

The plaintiff produced evidence tending to show that Cate ex-ercised due care to ascertain whether a train was coming. He did more. He produced evidence tending to show that before driving upon the track Cate pulled up his horse, looked both ways and listened for trains, whether due care required all these precautions or not. But proof of due care, or extraordinary care, in this one

respect was not enough. If Cate's stopping, looking, and listening informed him of the train's approach, a further duty of carefulness — carefulness to avoid contact with the discovered train — devolved upon him. Unless it can be determined from the evidence either (1) that Cate's stopping, looking, and listening left him in ignorance of the train's approach, or (2) that Cate discharged that further duty of carefulness, Cate's innocence of fault does not appear and the plaintiff fails.

(1) Is there any evidence from which reasonable men can determine that, notwithstanding his stopping, looking, and listening, Cate was unaware of the near approaching train?

There is no direct evidence as to his knowledge or ignorance, and whether his attitude and appearance as he drove upon the track indicated knowledge or ignorance is unknown. His opportunities for seeing and hearing are perfectly consistent with the supposition that he saw and heard. At what point he stopped to look and listen does not appear. From the vicinity of the house his view back to the station was unobstructed; as he drove along toward the end of the fence, while he could not see the train itself, the reflection of the train lights and the glow from the open furnace door were plainly visible above the fence through otherwise unbroken darkness; and when he passed the fence the train itself was in full view. It is undisputed that the bell was ringing; the rumble of the train was discernible to the hearing unless the circumstances were very unfavorable, and there was no evidence that they were unfavorable or that Cate was deaf. By what process available to human reason can it be determined from these mechanical facts that Cate, by looking and listening, and checking his horse as he did so, failed either to see or hear?

What evidence is there, then, on the question of Cate's knowledge? The fact that the engineer did not see Cate's team until he was within three or four rods of it? The lighted train was visible to Cate long before Cate's unlighted team was visible through the darkness to the engineer. The accident? It had no tendency to prove ignorance of the situation. As from the fact that Larivee was struck by the bridge it could not be presumed that the guard failed to notify him (*Deschenes* v. *Railroad*), so from the fact that Cate was struck by the train it cannot be presumed that his stopping, looking, and listening failed to notify him.

(2) Is there any evidence from which reasonable men can determine the alternative fact that, if Cate was aware of the train's approach, he used due care to avoid the collision? The opinion suggests none. Except upon the question of his looking and listening, there is not a scintilla of evidence in the record as to his

conduct. The facts that Cate is dead and that no person saw him as he drove upon the track cannot take the place of legal proof.

III. Upon the question of causal connection between the collision and the supposed negligence of the defendants, the verdict is an equally unfounded guess. The special findings in effect were that Cate relied upon the whistle to notify him of the approach of the train. But what evidence is there that Cate did so rely?

According to the plaintiff's uncontradicted evidence, Cate stopped, and looked, and listened. If he did, he relied upon his senses of sight and hearing — not upon the whistle. The jury's findings thus discard the only evidence in the case that throws the least light upon Cate's conduct. By eliminating that evidence from the record, the want of evidence that Cate in fact relied upon the whistle is not supplied, while such elimination leaves the case an exact counterpart of *Huntress* v. *Railroad*, without a scintilla of evidence that Cate exercised any care.

CHASE, J. Cate's uniform habit of slackening the speed of his horse to a walk at the Waukewan crossing, and looking and listening for the approach of a train before attempting to pass the crossing, tended to show that he did so on his fatal trip. It was substantial evidence of the exercise of care on that occasion. *Davis* v. *Railroad*, 68 N. H. 247, 248, and authorities cited.

But it is said that this evidence proves too much to be of benefit to the plaintiff; that if Cate did exercise care to that extent, he must have discovered the approach of the train, and consequently must have been guilty of negligence in attempting to pass over the crossing ahead of it; that this evidence in connection with the other evidence bearing on the question is so uniform and weighty that impartial and reasonable men could not arrive at different conclusions upon it, but must agree that Cate's death was caused by his own negligence. This makes it necessary to examine the evidence sufficiently to ascertain whether it possessed uniformity and weight to the degree alleged.

The elevated land between the highway and the railroad track, with the house and fence upon it, obstructed the view of the track from the highway more or less. The obstruction was greater at some points than others. The defendants' experiments showed that, with the conditions as they were on the evening when the experiments were made, the light from the locomotive and cars could be seen above the fence, or through cracks in it, the most, if not all, of the distance between the house and the crossing. This night was cloudy, but there was a moon; while on the night of the accident it was cloudy, misty, and dark. The persons observing the experiments knew that the train was on the track, and it

is fair to presume were specially alert in their efforts to see the light. They were there to make observations with a view of testifying in the case, and their attention was fixed upon the matter. Whether a man of average prudence, about to pass over a grade crossing, would take the same pains in attempting to discover the lights of an approaching train, and whether the lights would be discovered without such pains, were pure questions of fact. These differences in the conditions between the night of the experiment and the night of the accident affect the weight of the testimony. It was also necessary to determine whether the lights of the train were in the same places and of the same intensity as those of the colliding train. When Cate got opposite the end of the fence, he could see down the railroad for some distance — the distance increasing as he approached the track. The engineer of the train, who was looking ahead, did not see Cate's team until he was within three or four rods of it, and then saw only the horse's head and forward parts. They came from behind the fence, " right out of the darkness. " The curve in the road caused the headlight to send its rays to the westerly side of the track, until it came near the crossing. It would not be contrary to reason to conclude from this evidence, accompanied with a view, that Cate by his sense of sight did not discover, and by the exercise of ordinary care would not have discovered, the approach of the train in season to avoid the collision. If he saw the train at the moment when the engineer first saw his horse, it would not follow, as a matter of law, that he was in fault for not stopping, although his horse was gentle and not afraid of cars. *Folsom* v. *Railroad*, 68 N. H. 454.

But Cate was not called upon to rely upon the sense of sight alone. It was the duty of the defendants to give two long and two short whistles when their locomotive was eighty rods distant from the crossing. P. S., *c.* 159, *s.* 6. Cate was justified in relying upon a performance of this duty. *State* v. *Railroad*, 58 N. H. 408, 410 ; *Nutter* v. *Railroad*, 60 N. H. 483. Whether he was at liberty to rely upon it altogether is a question of fact, and not of law. *Mitchell* v. *Railroad*, 68 N. H. 96, 116.

It must be regarded as a fact that the whistle was not sounded on this occasion. There was competent evidence before the jury tending to establish this fact. The weight of the evidence depended largely upon the situations of the witnesses relative to the crossing at the time the whistle should have been sounded, their intelligence, their habits of observation, their candor, and their appearance generally — matters of which the jury had advantages for judging which the court do not have. Even if the defendants' evidence appeared to the court to be of much greater weight than the plain-

tiff's, it ought not to and could not affect the finding here,—nor at the trial term unless the preponderance of weight is so great as to show that the jury "were influenced by passion, prejudice, partiality, or corruption, or unwittingly fell into a plain mistake." *Fuller* v. *Bailey*, 58 N. H. 71; *Doughty* v. *Little*, 61 N. H. 365, 369; *Drown* v. *Hamilton*, 68 N. H. 23, 27. The jury found that Cate's want of knowledge of the approach of the train was due to the defendants' fault. The fault referred to seems to have been the failure to give the whistle for the crossing. The finding in effect was that Cate relied upon the whistle to notify him of the approach of the train. It would not be unreasonable for a man familiar with the two crossings mentioned in the case, as Cate must have been, to conclude that the train would not pass the second crossing, after whistling at the first, until it had whistled again.

It has been argued that the cases of employees against employers in which judgments have been directed for the defendants are authorities supporting the defendants' motion in this case. *Allen* v. *Railroad*, 69 N. H. 271, with other cases, was cited upon this point, and may be taken as a representative case so far as this argument is concerned. Allen, an experienced brakeman, mounted a moving box car so near to an overhead bridge, the existence and character of which he knew, that it was his duty to ascertain whether he was outside the bridge guard, if he intended to rely upon it to notify him of his approach to the bridge. If he had looked, he would have learned there was no guard. Upon these facts, about which there was no conflict in the evidence, it was held that he assumed the risk attending the passage under the unguarded bridge. Under the peculiar circumstances of the case, the railroad's failure to perform its duty increased Allen's responsibility for his own safety. It certainly was not a notice to him that he might safely attempt to pass the bridge as if it were properly guarded and he were outside the telltale. In this case, if Cate listened before attempting to cross the track, as the evidence tends to show that he did, he heard no whistle, because none was sounded. The defendants' failure of duty in this respect, instead of throwing the responsibility for Cate's safety in passing over the crossing upon him, was notice to him from the defendants that the crossing was not to be occupied by them. It was an instance in which acts, or rather the omission of acts, spoke louder than words. As has been already said, Cate might be justified in acting upon this notice. It might properly be found that men of average prudence would do so. In short, it conclusively appeared that Allen knew or ought to have known of the nature and imminence of the danger to which he was exposed, while it is doubtful, to say the least, whether Cate knew of the dangers that were before him, or was in fault for not knowing of them.

The defendants' motion to direct a verdict in their favor was properly denied. This conclusion is strongly supported by *Evans v. Railroad,* 66 N. H. 194, a case closely resembling this in many of the facts.

The jury were instructed that it was Cate's duty, before attempting to cross the track, "to take such precautions to learn of the approach of trains as men of ordinary prudence would take in like circumstances." The defendants admit that, "as an abstract proposition, this was unexceptionable." But they say the only precaution that can be taken in such cases is to look or listen for a train, or both; and, consequently, that the duty is to look or listen and should be so stated as matter of law. It is doubtful, to say the least, whether this is the only precaution available for the purpose. Familiarity with the manner in which the railroad is operated and the times when trains pass over it might excuse a traveler, under some circumstances, from looking or listening for a train when about to pass over the crossing. Other circumstances might show an exercise of ordinary care when there was a failure to look or listen. The law does not adopt particular circumstances as standards for measuring the degree of care required to amount to ordinary care. The circumstances in negligence cases are too numerous and variable to allow of this course. The rule must be so general that it may be applied to the circumstances of any case. Accordingly, the standard adopted is the care exercised by persons of average prudence under the same circumstances. It may be — often is — difficult to determine what this care would be in a given case. So far as known, a person may never have been called upon to act under the same circumstances. The question oftentimes must be determined by an exercise of sound common sense, in the light of one's general knowledge acquired by observation and experience. A jury, composed, as it is, of twelve impartial men drawn from different walks in life, is as capable of correctly determining such a question, as a court composed of a less number of men whose training, occupation, and experience have not been so favorable for fitting them to form a sound judgment on the question. It certainly must be as apparent to jurymen as to members of the court that a person of average prudence will, under most circumstances, look or listen for a train when about to pass over a grade crossing. There is no more likelihood that a jury will be swayed by prejudice or passion in cases of this kind than in many other cases. If the defendants' views were adopted, it would take this class of cases out from the operation of the general rule governing negligence cases. It would also conflict with the general spirit of the law of the state. There is no sufficient reason for making such an exception. The instruction given correctly stated the rule

of law applicable to the circumstances of the case, and the defendants' exception to it must be overruled.

The defendants' exception to the instruction as to the relevancy of the testimony concerning Cate's habit of checking the speed of his horse, and looking and listening for trains when about to go over the Waukewan crossing, must also be overruled.  *State* v. *Railroad*, 52 N. H. 528, 549, 550.  The jury were told that they were to consider this habit " only as having some tendency to show that he checked his horse, looked, and listened on the night of the accident, as usual."  Such a consideration of it excludes its consideration as proof that Cate was a cautious and careful man.  The defendants' request was given in substance, and they have no ground for complaint.

*Exceptions overruled.*

PARSONS, J., did not sit: the others concurred.